In the Matter of Jerald INGERSOLL, Debtor.

IXONIA STATE BANK, Plaintiff,

v.

Jerald INGERSOLL et al., Defendants.

Bankruptcy No. 80–0162.

United States Bankruptcy Court, W. D. Wisconsin.

Feb. 9, 1981.

Johnson, Brendemuehl, Swendson & Georgeson by William A. Swendson, Oconomowoc, Wis., for Ixonia State Bank, plaintiff.

James J. Caldwell of Rummel, Caldwell, Cahill, Daly & McNeil, Oconomowoc, Wis., for Jerald L. Ingersoll, defendant.

Robert Bender of Dirker & Bender, S. C., Watertown, Wis., for Farmers State Bank, defendant.

Bruce W. Freeberg, Jefferson, Wis., for Jefferson County Farmco Cooperative, defendant.

J. M. Slechta of Slechta & D'Aoust Law Offices, Jefferson, Wis., for Jefferson County Bank, defendant.

ROBERT D. MARTIN, Bankruptcy Judge.

While engaged in sod farming and other business, Jerald Ingersoll, obtained loans from the Jefferson County Bank, Jefferson Farmco Cooperative (Co-op), Farmers State Bank (Farmers) and Ixonia State Bank (Ixonia). Ingersoll filed a Chapter 7 petition April 8, 1980. On May 20, the trustee abandoned the Ingersoll farm. On September 3, Ixonia filed a complaint in Jefferson County Circuit Court seeking foreclosure on the farm. Ingersoll removed that action to this Court. Co-op filed a proof of claim for outstanding loans amounting to $113,824.31. Farmers filed a proof of claim for $25,-494.31. Ixonia filed no proof of claim but had outstanding loans amounting to $140,-390.55 as of November 25, 1980. The Jefferson County Bank holds a recorded first mortgage and is not a party to the pending motions. Ixonia and Ingersoll have moved for summary judgment to determine the validity of Ixonia, Farmers and Co-op's secured claims. Each of the creditors claims a security interest in the Ingersoll farm, which includes Ingersoll's homestead. Ixonia Co-op and Farmers each recorded a Consumer Real Estate Security Agreement signed by Ingersoll. Their claims to secured status are based on the Consumer Real Estate Security Agreements (hereinafter Agreements).

By his motion for summary judgment, Ingersoll has challenged the validity of the secured claims of the plaintiff and all his co-defendants except the Jefferson County Bank on the following grounds:

1. the Agreements are invalid because they include a "dragnet" clause which states that the collateral identified is securi-ty for all obligations, whenever incurred, owed or to be owed by the debtor to the creditor;

2. the Agreements cannot create security for antecedent debts, but are limited to securing funds advanced in specific consideration of the Agreements;

3. the Agreements are part of a "consumer credit transaction" therefore remedies are limited to those in the Wisconsin Consumer Act which does not include foreclosure;

4. that the Ixonia Agreement secures a maximum of $25,000 as indicated on the face of the document;

5. the Agreements are invalid for lack of consideration; and

6. the creditors failed to disclose to Ingersoll his right to rescind as required by the Truth in Lending Act making the Agreements unenforceable.

These grounds, or their obverse, are the basis for the motion for summary filed by Ixonia as well.

A. *Are the Agreements Invalid Because They Contain a "Dragnet" Clause?*

■ Ingersoll argues that the Agreements are invalid because they include a "dragnet" clause. "Dragnet" clauses are enforceable under Wisconsin law. In *Capocasa v. First Nat. Bank*, 36 Wis.2d 714, 154 N.W.2d 271 (1967). The court stated:

There seems to be no good reason for one who has executed a mortgage with "dragnet" clause to be permitted to escape its consequences for his personal borrowing merely because subjectively it was not within his contemplation (contrary to the words of the written instrument) that an additional obligation to the same creditor would subject his property to the "dragnet" feature of the mortgage. *Id.* at 724, 154 N.W.2d 271.

In *John Miller Supply Co. v. Western State Bank*, 55 Wis.2d 385, 199 N.W.2d 161 (1972) the court stated:

In *Capocasa v. First Nat. Bank* (1967), 36 Wis.2d 714, 154 N.W.2d 271, this court

recognized the desirability, in proper circumstances, of security instruments to secure future advances or obligations. We pointed out, however, that such documents would be closely scrutinized and would be enforced only to the extent that the future transactions or liabilities sought to be secured were in clear contemplation of the parties.

What was contemplated by the parties is, of course, to be determined initially from a reasonable reading of the language of the agreement... *Id.* at 392, 199 N.W.2d 161.

■ The language in paragraph (2) of the Ixonia Agreement explicitly refers to securing "debts, obligations and liabilities of any Customer to Lender arising out of . . . credit granted in the future by Lender to any Customer . . ." The Farmers and Co-op Agreements state: "to secure Customer's debts, obligations and liabilities to Lender arising out of existing or future credit granted by Lender to Customer . . ." Ingersoll makes no argument and presents no evidence that would rebut the inference drawn from the Agreements' language that the parties intended the Agreements to secure future loans. Ingersoll's deposition also supports this view as to the Ixonia Agreement (Exhibit 4 at the deposition).

Q: Is it fair to say that you executed this Exhibit Number 4, because you were requested to by the Ixonia State Bank, and for that reason only?

A: That I did it because of their request?

Q: Yes.

A: That was one of the reasons, yes.

Q: What other reasons were there that you signed that?

A: Well, it was just, I suppose, to beef up my line of credit. The bank said that the bank examiners were putting pressure on.

Q: Are there any other reasons why you signed it?

A: So I could keep going with my credit at the bank, I guess was the main reason. For myself.

Q: Were there any other reasons besides that?

A: Well, I told you before, Mr. Buelter said it would protect the farm. They were doing it for protection.

Q: Were there any other reasons besides those two or three?

A: Not that I know of, no.

(Ingersoll deposition, pages 25 and 26.)

Ingersoll signed the Ixonia Agreement for the purpose of maintaining his credit line. It is reasonable to believe he understood and intended that his property would secure future credit extended to him. Following the test adopted by the Wisconsin courts, the "dragnet" clauses of the Agreements are enforceable in this case. The unambiguous language of the Agreements shows the parties intended the loans to be secured, and the only evidence of Ingersoll's intent supports the same conclusion.

### B. *Do the Agreements Secure Antecedent Debts?*

■ Ingersoll argues that the Agreements do not secure antecedent debts. The Ixonia Agreement, paragraph 2, states:

Grants Lender a continuing lien on the Property to secure all debts, obligations and liabilities of any Customer to Lender arising out of credit previously granted, credit contemporaneously granted or credit granted in the future by Lender to any Customer, to any Customer and another, or to another guaranteed or endorsed by any Customer, except credit in an original amount of less than $1,000.00, the granting of which is subject to the Wisconsin Consumer Act ("Obligations").

Paragraph 2 on the Co-op and Farmers Agreement is similar, stating:

Grant Lender a continuing lien on the Property to secure Customer's debts, obligations and liabilities to Lender arising out of existing or future credit granted by Lender to Customer, to Customer and another, or to another guaranteed or endorsed by Customer, except credit in an original amount of less than $1,000.00, the granting of which is subject to the Wisconsin Consumer Act ("Obligations").

The language of all the Agreements explicitly includes a lien for antecedent debts. Ingersoll's argument has no merit, unless that language is for some reason invalid.

■ There is nothing in Wisconsin law that prohibits acquiring a security interest for antecedent debts. In *Evenson v. Bates*, 58 Wis. 24, 15 N.W. 837 (1883), Bates had given a note to Evenson for $1,500. Sometime later he executed a mortgage to Evenson for $5,000 to secure the $1,500 prior note and future advances. Bates argued the mortgage did not secure the $1,500 note given prior to the mortgage. Both the trial court and the Supreme Court rejected that argument and found the mortgage secured the prior $1,500 note. The Agreements secure antecedent debts.

C. *Are the Agreements Part of a Consumer Credit Transaction and Therefore Limited to the Remedies of the Wisconsin Consumer Act?*

"Consumer credit transactions" means a consumer transaction between a merchant and a customer in which real or personal property, services, or money is acquired on credit and the customer's obligation is payable in instalments or for which credit a finance charge is or may be imposed, whether such transaction is pursuant to an open-end credit plan or is a transaction involving other than open-end credit. The term includes consumer credit sales, consumer loans, consumer leases and transactions pursuant to open-end credit plans. Wis.Stats. § 421.-301(10).

"Customer" means a person other than an organization (s. 421.301(28)) who seeks or acquires real or personal property, services, money or credit for personal, family, household or agricultural purposes.... Wis.Stats. § 421.301(17).

■ Ingersoll obtained the loans as an individual, not as the agent for an organization. The Ixonia and Co-op loans were for agricultural purposes, so as to them Ingersoll was a "customer" and the loans are "consumer credit transactions" within the meaning of the Wisconsin Consumer Act

(WCA). There is a dispute as to the nature of Farmers' loans, some of which may have been for commercial or business purposes. As to loans Ingersoll procured for business purposes, he would not be a "customer" under the WCA's definition and the loans therefore could not be "consumer credit transactions."

The Ixonia and Co-op Agreements provide remedies in case of default which specifically include foreclosure "unless notice to Customer and an opportunity to cure is required by § 425.103 Wis.Stats., and, in that event shall become payable if such default is not cured as provided in that statute within 15 calendar days after mailing of such notice or as otherwise provided by law." Chapter 425 of the WCA applies to "actions or other proceedings brought by a creditor to enforce rights arising from consumer credit transactions and to extortionate extensions of credit under s. 425.-108." Wis.Stats. § 425.102. Because the Ixonia and Co-op loans are consumer credit transactions, the WCA, Chapter 425, applies unless the loans fit within an excluded category. Wis.Stats. § 421.202(6) states:

This act does not apply to:

(6) Consumer credit transactions in which the amount financed exceeds $25,000 or other consumer transactions in which the cash price exceeds $25,000 ...

The "amount financed" for consumer credit transactions is defined in Wis.Stats. § 421.301(5), which states in pertinent part:

"Amount financed" in a consumer credit transaction means the total of the following items from which any prepaid finance charge or required deposit balance has been excluded:

(a) [I]n a consumer loan, the amount paid to, receivable by or paid or payable to the customer or to another person in his behalf

. . . . .

As of November 25, 1980, Ingersoll was indebted to Ixonia in the amount of $140,-309.55 in principal and interest. The loans comprising that amount were made at various times in varying amounts, only one of

which had a principal amount less than $25,000. That note, dated June 5, 1979, was in the amount of $17,520.65. That loan, made for agricultural purposes, is a consumer credit transaction to which the Wisconsin Consumer Act applies. Upon default, a notice of right to cure is generally required. "A merchant may not accelerate the maturity of a consumer credit transaction, or commence any action, except as provided in s. 425.205(6) . . . unless the merchant believes the customer to be in default (s. 425.103), and then only upon the expiration of 15 days after a notice is given pursuant to s. 425.104 if the customer has the right to cure under this section." Wis. Stats. § 425.105(1). No right to cure exists according to Wis.Stats. § 425.105(3) if the following occurred twice during the preceding twelve months:

(a) The customer was in default on the same transaction or open-end credit plan;

(b) The creditor gave the customer notice of the right to cure such previous default in accordance with s. 425.104; and

(c) The customer cured the previous default.

The implication is if Wis.Stats. § 425.105(3) is not met, a right to cure exists for all other consumer credit transactions within the Wisconsin Consumer Act.

■ Notice to cure default was required by the Wisconsin Consumer Act as to the Ixonia loan where the amount financed was less than $25,000, before Ixonia could commence an action upon it. There is no evidence in the record as to the giving of or absence of a notice of right to cure, therefore summary judgment as to the $17,520.65 note is inappropriate. As to the other Ixonia notes, the Wisconsin Consumer Act does not apply and Ixonia was free to exercise the remedy included in their Agreement, i. e., foreclosure.

■ The Farmers and Co-op loans may or may not be included under the Wisconsin Consumer Act. Evidence as to amounts and purpose for each of the loans is required before that can be determined. If some of the loans were within the scope of the WCA and if no notice of right to cure

was given when Ingersoll defaulted, the remedy is unclear. Many sections of the WCA included a statutory reference for the remedy available if the section is violated. That is not the case for the cure provisions in Wis.Stats. § 425.104 and § 425.105. The remedy that appears to apply states:

(1) Any charge, practice, term, clause, provision, security interest or other action or conduct in violation of chs. 421 to 427, to the extent that the same is in violation of chs. 421 to 427, shall confer no rights or obligations enforceable by action.

(2) This section shall not affect the enforcement of any provision that is not prohibited by chs. 421 to 427. Wis.Stats. Ann. § 425.306 (1980–1981 Supp.)

Wis.Stats. § 425.105 requires a notice of right to cure and the expiration of a fifteen-day cure period before the creditor may proceed. If the notice of right to cure was not given for the loans covered by the WCA, the creditors could not commence an action on those loans. According to Wis. Stats. § 425.306, the actions would "confer no rights or obligations enforceable by action," therefore, it would appear absent a showing of compliance with the WCA prior to distribution of the proceeds, Ixonia could not recover its $17,520.65 note in this foreclosure action.

D. *Is the Ixonia Agreement Limited to A Security Interest of $25,000?*

Ingersoll argues the Ixonia Agreement must be limited to securing $25,000. The caption at the top of the Agreement states:

CONSUMER REAL ESTATE SECURITY AGREEMENT

(Loans to individuals for personal, family, household or agricultural purposes where amount financed is $25,000 or less.)

The caption Ingersoll refers to is not part of the body of the Agreement where the conditions are set out. No where in the body is $25,000 stated as maximum for the Agreement. At the December 10, 1980, deposition, Ingersoll admitted he did not rely on the $25,000 or less language as a limit for Ixonia's security.

Q: Did you rely on the language that you read that appears on the top of Exhibit Number 4 in parentheses under the title which states, "Loans to individuals for personal, family, household, and agricultural purposes, where the amount financed is $25,000.00 or less.". Did you execute that document because of that language—in any way because of that language?

A: Like I said before, I didn't recall anything about this what it really meant, except it was giving the bank extra security. The amount of the note here was covered by farm machinery, crops, and this so-called real estate security. We never had any dollar amount so to speak in the whole or as to what each thing was worth, so I can't answer that one way or the other. I really can't, because all I did was sign these papers.

Q: Do you recall reading that language at the time that you executed the note?

A: I recall reading—we went over this a little bit, but I don't recall the dollar amount. (Ingersoll deposition, page 25.)

Comparing the language of the Ixonia Agreement which includes the $25,000 or less caption and the language of the Co-op's Agreement that does not include the $25,000 caption, there are only three differences in the language contained in the bodies of the Agreements. Only one of these could be considered significant. In paragraph 3(d), the Ixonia Agreement contains the additional clause "Customer agrees to be bound by sec. 846.101, Wis.Stats., and as the same may be renumbered or amended from time to time ..." Wis.Stats. § 846.101 regards foreclosure actions on real property of twenty acres or less. The property at issue here includes approximately one hundred eighty acres, therefore, Wis.Stats. § 846.101 could not apply.

■ The language of the Ixonia Agreement and the Co-op Agreement are virtually the same except for the $25,000 limit stated in the caption on the Ixonia Agreement. The evidence presently before the court demonstrates no reliance by Ingersoll on the limit stated in the caption. The direct testimony of Ingersoll rebuts any claim of reliance made on his behalf by the motion for summary judgment and no other evidence is offered or identified as potentially available. It would be unreasonable to limit the security rights to that amount without strong legal or equitable grounds.

### E. Are the Agreements Invalid Because of Lack of Consideration?

■ Ingersoll argues that the Agreements do not secure his debts because no new consideration was given at the time he signed the Agreements. Ingersoll signed an Agreement with the Farmers State Bank which was recorded with the Jefferson County Register of Deeds on March 22, 1977. On that date, Ingersoll owed Farmers $19,630.88. Ingersoll signed an Agreement with the Co-op which was recorded with the Jefferson County Register of Deeds on May 16, 1977. Co-op lent money to Ingersoll at times not in the record, but these loans were incorporated into a new note for $103,377.34 dated August 28, 1979. Ingersoll signed an Agreement with the Ixonia State Bank on October 13, 1978, at which time Ixonia loans totalled $150,541.45. That Agreement was recorded with the Jefferson County Register of Deeds on October 23, 1978. A legal mortgage does not require consideration. To the extent that there must be an obligation for the mortgage to secure, the validity of the mortgage depends indirectly on consideration for the obligation. Osborne, *Mortgages* (1970), § 107, page 168. Therefore, if the notes for which the Agreements provide security are valid, and the Agreements are treated the same as a mortgage, they do not fail for lack of consideration. Nevertheless, assuming consideration is required for the Agreements to be valid, consideration for each of the Agreements exists.

■ The three Agreements Ingersoll signed were sealed instruments. Assuming the Agreements are executory instruments, the seal is "presumptive evidence of a sufficient consideration." Wis.Stat. § 891.27. To rebut that presumption Ingersoll argues that no consideration was given simulta-

neous with the signing of the Agreements. Wisconsin has adopted Williston's definition of consideration, "that it may consist of a detriment to the promisee or a benefit to the promisor." *First Wisconsin Nat. Bank v. Oby*, 52 Wis.2d 1, 6, 188 N.W.2d 454 (1971). In the footnote to this definition, the court quoted 17 C.J.S. *Contracts* § 74, pages 757–761, stating:

It may be laid down as a general rule, in accordance with the definition given supra sec. 70, that there is a sufficient consideration for a promise if there is any benefit to the promisor or any loss or detriment to the promisee. In this respect, any benefit, profit or advantage flowing to the promisor which he would not have received but for the contract constitutes a sufficient consideration therefor. It is not necessary, however, that a benefit should accrue to the person making the promise; it is sufficient that something valuable flows from the person to whom it is made, or that he suffers some prejudice or inconvenience, and that the promise is the inducement to the transaction.

Indeed, there is a consideration if the promisee, in return for the promise, does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do, whether or not there is any actual loss or detriment to him or actual benefit to the promisor...

Although there is no evidence that new money was advanced at the time the Agreements were signed, Ingersoll already owed each creditor substantial sums, which each institution continued to renew, although that was not legally required. The creditors' actions fit within the definition of consideration by "conferring a benefit to the promisor." There is no requirement that the debt must be created simultaneously with the security agreement in order for the security agreement to be valid. In *Doyon & Rayne Lumber Co. v. Nichols*, 196 Wis. 387, 220 N.W. 181 (1928), the court held that mortgages originally created prior to the extension of credit became valid security interests at the time the value was given.

Mortgages have been held to validly secure pre-existing debts. *Campbell v. Bagley*, 276 F.2d 28 (5th Cir. 1960); *Hewitt v. Powers*, 84 Ind. 295 (1882); *Rea v. Wilson*, 112 Iowa 517, 84 N.W. 539 (1900); and *Barrett v. Weber*, 125 N.Y. 18, 25 N.E. 1068 (1890). In addition, a precedent debt is sufficient consideration, as between the parties to support a mortgage. 55 Am. Jur.2d, *Mortgages*, § 100, page 257.

### F. Are the Agreements Invalid Because of the Creditors' failure to Disclose Ingersoll's Right to Rescind?

■■■ It has been argued that the Agreements are invalid or unenforceable because of the creditors' failure to disclose to Ingersoll his right to rescind a transaction involving security interests in real property as required by 15 U.S.C. § 1635. Assuming, arguendo, that the notice of right to rescission was required for all loans secured under the Agreements herein, and assuming that *no notices were actually given* Ingersoll, what would the remedy be?

Civil liability is set out in 15 U.S.C. § 1640(a) which states:

(a) *Individual or class action for damages; amount of award; factors determining amount of award.*

Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of— ...

The chapter provides several ways to measure the dollar recovery allowable. It does not make a transaction invalid or unenforceable.

Several cases have discussed whether a violation of the Federal disclosure law renders an obligation unenforceable. Their unanimous answer has been that the remedies available are those provided within § 1640 which does not include voiding the transaction. In *Burgess v. Charlottesville Savings and Loan Ass'n.*, 477 F.2d 40 (4th Cir. 1973), the court stated:

For failure to make disclosure as required the Act provides it own remedy. Section

1640, 15 U.S.C.... Though not essential to the determination of this case, a proper construction of the Act indicates that any private action for violation thereof is limited to the statutory remedy and can provide no basis for other relief. *Id.* at 45.

In *Charter Finance Company v. Henderson*, 60 Ill.2d 323, 326 N.E.2d 372 (1975), the court stated:

> [N]either Missouri nor Federal law provides that failure to make proper disclosures renders a note unenforceable. Criminal and civil penalties may be imposed for failure to properly disclose ... but the note itself is still valid and unenforceable. *Id.* 326 N.E.2d at 376.

Similarly in *Smith v. Society Nat. Bank*, 141 Ga.App. 19, 232 S.E.2d 367 (1977), the court stated:

> Violations of that Act give rise to the remedies therein prescribed (15 U.S.C.A. § 1640) and do not serve to invalidate the contract and thus, in this case to prevent the lender from repossessing the property. As held in *Grandway Credit Corp. v. Brown*, 295 So.2d 714, 715 (Fla.App.), the Truth in Lending Act provides for "its own penalties upon violation thereof (15 U.S.C.A. § 1640) and does not affect the validity or enforceability of valid legal obligations." *Id.* 232 S.E.2d at 368, 369.

In a recent decision, a Georgia court stated a violation of the Truth In Lending Act would constitute no defense to the foreclosure proceedings.

> The fact that the defendant might recover from the plaintiff for violation of Truth in Lending might be utilized to offset the entire debt owed but would not alter the fact that a default occurred nor in any way serve to prevent the plaintiff from proceeding with foreclosure. *First Citizens Bank & Trust Co. v. Owings*, 259 S.E.2d 747, 748, 749, 151 Ga.App. 389 (1979).

This violation of the Truth in Lending Act (failure to disclose the right to rescind) would not invalidate or render unenforceable the notes and agreements under Federal law.

There is no additional right to rescind under Wisconsin law except in consumer approval transactions. Wis.Stats. § 423.202. (The notes involved here are not consumer approval transactions.) Some violations of the Wisconsin Consumer Act result in unenforceable obligations, but disclosure of a right to rescind is not required by the Wisconsin Consumer Act. Therefore, the only penalties or damages available are under Federal law. Claims for damages allowed by 15 U.S.C. § 1640 would be the remedy available if a violation of the Truth in Lending Act is proved. Rights and claims created under the Truth in Lending Act have consistently been held to pass to the trustee in bankruptcy. *Binnick v. Avco Financial Services of Neb.*, 435 F.Supp. 359 (D.Neb.1977); *Murphy v. Household Finance Corp.*, 560 F.2d 206 (6th Cir. 1977); *In Re Dunne, Liberty Loan Corp. v. Boyajian*, 407 F.Supp. 308 (D.R.I.1976); *Porter v. Household Finance Corp.*, 385 F.Supp. 336 (S.D.Ohio 1974). Presumably Ingersoll no longer possesses the Truth in Lending claim which he asserts as a defense to the foreclosure action, but even if they were his to assert, the failure to disclose the right to rescind does not make the security agreements and notes unenforceable. The remedy is limited to that provided in 15 U.S.C. § 1640.

Upon the foregoing analysis which constitutes my findings of fact and conclusions of law in this matter:

1. Ixonia is entitled to summary judgment in its favor on all claims against Ingersoll except the note for $17,520.65 as to which there must be proof of compliance with the Wisconsin Consumer Act provisions for notice of right to cure, and judgment may be entered accordingly.

2. Ingersoll is not entitled to summary judgment against Ixonia or his co-defendants.

3. Questions as to the amount, nature, and purpose of loans made to Ingersoll by Co-op and Farmers remain for determination at trial.

4. The terms of the pretrial order dated November 6, 1980, shall remain in force and control the conduct of this adversary proceeding to the extent not inconsistent with this decision.